## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Dec 23 2019, 6:14 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Don R. Hostetler
Indianapolis, Indiana

ATTORNEYS FOR APPELLEES

Curtis T. Hill, Jr.
Attorney General of Indiana

David E. Corey
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Termination of the Parent-Child Relationship of:<br><br>T.T., M.T., S.T., D.T. (Minor Children)<br><br>and<br><br>T.T. (Father),<br><br>*Appellant-Respondent,*<br><br>v.<br><br>Indiana Department of Child Services,<br><br>*Appellee-Petitioner*<br><br>and | December 23, 2019<br><br>Court of Appeals Case No. 19A-JT-1616<br><br>Appeal from the Marion Superior Court<br><br>The Honorable Marilyn Moores, Judge<br><br>The Honorable Scott Stowers, Magistrate<br><br>Trial Court Cause Nos. 49D09-1808-JT-1010, 49D09-1808-JT-1011, 49D09-1808-JT-1012, 49D09-1808-JT-1013 |

Child Advocates, Inc.,

*Appellee-Guardian Ad Litem*

**Altice, Judge.**

## Case Summary

[1] T.T. (Father) appeals from the involuntary termination of his parental rights to his minor children, T.T., M.T., S.T., and D.T. (collectively, the Children). He challenges the sufficiency of the evidence supporting the termination order.[1]

[2] We affirm.

## Facts & Procedural History

[3] Father is currently twenty-seven years old and has four children with Mother. Their son T.T. was born in October 2009, daughter M.T. was born in October 2010, daughter S.T. was born in February 2014, and son D.T. was born in March 2016. D.T. was diagnosed with cystic fibrosis about ten days after birth

---

[1] The Children's mother's rights were also terminated, but M.D. (Mother) does not participate in this appeal.

and has extensive medical and special needs. Mother was the primary caregiver for the Children, and Father worked various construction-related jobs.

[4] The Indiana Department of Child Services (DCS) became involved with the family shortly after D.T.'s birth because Mother and Father (collectively, Parents) had failed to meet D.T.'s medical needs. The family also suffered from financial instability and deplorable living conditions. Parents agreed to an informal adjustment (IA) with DCS, including participation in homebased therapy and case management services. The IA was approved by the trial court on August 1, 2016. Parents, however, failed to substantially comply with the terms of the IA, resulting in the trial court closing the IA as unsuccessful in February 2017.

[5] DCS filed a CHINS petition on February 21, 2017, alleging that the Children were in need of services because Parents failed to provide them with a safe, stable, and appropriate living environment, lacked stable housing and financial means to meet the needs of the Children, and failed to ensure that D.T. received all necessary medical care. At the initial/detention hearing held that same day, the trial court ordered the removal of the Children from Parents' care. The trial court authorized a temporary trial visit (TTV) once certain conditions were met.

[6] By March 3, 2017, all the Children except D.T., who was hospitalized at Riley Hospital, had been returned to Mother's care and custody through a TTV. Shortly thereafter, on March 18, D.T. was discharged from the hospital and placed on a TTV. The trial court ordered D.T.'s removal about a month later

due to a number of missed follow-up medical appointments. D.T. has remained in his foster placement since this removal.

[7] Following a factfinding hearing on April 28, 2017, the trial court adjudicated the Children CHINS. Mother admitted that the Children were CHINS because she needed assistance obtaining stable housing and caring for medically frail D.T. Father contested the adjudication. In the lengthy CHINS order, the trial court detailed D.T.'s medical condition, including that he has cystic fibrosis and requires a g-tube. The court's findings included that D.T.'s primary pediatric pulmonologist, though familiar with Mother, had never met Father and that Father had not participated in D.T.'s medical treatment meetings or care conferences despite D.T. being hospitalized at Riley from January 30, 2017 to March 18, 2017. Additionally, Father had not participated in g-tube training at Riley. The pulmonologist opined that D.T.'s health had been compromised by Parents' lack of medical follow up, failure to closely follow the treatment plan, and exposure to smoke, and he expressed concern about D.T.'s health if placed in Father's care. The trial court's findings also noted that Parents lacked stable housing and that Father had not been engaged with service providers during either the IA or the CHINS. The trial court permitted T.T., M.T., and S.T. to remain on TTV. D.T. remained in foster placement.

[8] On May 19, 2017, the CHINS case proceeded to disposition. Parents were ordered to cooperate with services recommended by Cross Systems Care Coordination and the child and family team, including homebased therapy for both, homebased case management for Mother, and Father Engagement for

Father. In the dispositional order, the court warned Parents that failure to participate in services could lead to termination of parental rights. The dispositional order was later modified as to Mother and she was ordered to participate in substance abuse evaluation, random drug screens, and domestic violence services.

[9] Early in the morning on June 1, 2017, Father committed armed robbery and other related crimes. He has remained incarcerated since that day, first in jail and then prison. In January 2018, he pled guilty, pursuant to a plea agreement, to Level 3 felony robbery, Level 5 felony battery, Level 5 felony intimidation, and two counts of Level 6 felony pointing a firearm. Thereafter, he received an aggregate sentence of nineteen years, with twelve executed in prison and seven suspended to probation.

[10] On August 9, 2017, T.T., M.T., and S.T were removed from Mother's home and placed in kinship care with L.S., a longtime family friend. This resulted from Mother's illegal drug use and her inconsistency with services. After the TTV ended, Mother continued to struggle with illegal drugs, failed to comply with services, and did not attend subsequent CHINS hearings. T.T., M.T., and S.T have not been returned to Mother's care.

[11] Due to Father's incarceration, family case manager (FCM) Brittany Mitchell sent Father letters and copies of orders from the CHINS case. She included return envelopes with every letter, but Father never wrote back or otherwise reached out to her for available services, such as Father Engagement.

[12] The permanency plan in the CHINS proceedings changed to adoption in July 2018, and the following month, DCS filed a petition for the involuntary termination of parent-child relationship (TPR Petition) with respect to each of the Children. FCM Mitchell visited Father in prison and served him with the TPR Petitions. After learning of the pending termination proceedings, Father began to send written correspondence to FCM Mitchell for her and the Children. Additionally, on September 17, 2018, Father started a program called recovery while incarcerated (the RWI Program) to address issues with substance abuse. Father hoped to obtain a sentence modification, such as being placed on house arrest, after completing the program.

[13] The termination factfinding hearing was held on May 1, 2019. The evidence established that the family began receiving services from DCS during the IA, which started in August 2016, and services continued during the CHINS proceedings. Sherri Kelley, a homebased therapist who began working with the family around September 2016, testified that during her nine months with them, she had minimal contact with Father. He expressed to her that "he had no issues, it was all [Mother's] fault that they were even in the situation and basically, [Mother] needed to deal with it." *Transcript* at 59. Kelley observed Father criticize and insult Mother, and Kelley described an incident where Father, after being thrown out of the home by Mother, returned with a gun and removed the Children in the middle of the night. Kelley testified that she had also observed Mother with a black eye. She opined, based on her experience

with domestic violence, that it was not safe for Mother or the Children to be around Father.

[14] Similarly, FCM Mitchell expressed concerns about domestic violence, and she testified that Parents did not complete any of the services during the IA. When DCS filed the CHINS petition in February 2017, after six months of services through the IA, Parents continued to lack stable housing, the family's living conditions were inadequate, and Parents were not properly attending to D.T.'s medical needs. Father continued to have access to services up to his incarceration in June 2017, and he could have worked with a Father Engagement worker while in prison, but he never reached out for this service.

[15] During his own testimony, Father acknowledged that he did not really do much during the IA and that he relied on Mother to complete the services while he worked. He explained, "I just really didn't think it was that big of a deal at the time." *Transcript* at 138. Father also testified that during the CHINS proceedings he and Mother had "a toxic relationship" and he was drinking a lot on the weekends and taking various kinds of drugs, including heroin, cocaine, and methamphetamine. Then, just over a month after the Children were adjudicated CHINS, he committed an armed robbery on June 1, 2017, which led to his ongoing incarceration. After being in prison for six months and learning of the TPR Petition, Father began the RWI Program on September 17, 2018. Father testified that he was close to graduating from the RWI Program

and then would seek a potential sentence modification.[2] At the time of the termination hearing, however, Father's sentence had not been modified and his anticipated release from prison was November 2025.[3]

[16] The Guardian ad Litem (GAL), appointed in February 2017, testified that the Children's current permanency plan was adoption and that she did not believe it was in the Children's best interests to give Father more time to work toward reunification. She noted that Father had been given a lot of time to engage in services and had done nothing and made no progress, even when not incarcerated, and that Father had been incarcerated for nearly two years. Moreover, the GAL testified that her position regarding adoption being the correct plan for the Children would not change even if Father were to be released early from prison.

[17] FCM Mitchell agreed that Father should not be given additional time to work toward reunification, as he had not made any progress in his ability to care for the Children and would be incarcerated for another six years. She observed that Father's "current incarceration was a result of a choice that he directly

---

[2] The criminal court's sentencing order indicated that the court would consider a modification to the sentence if Father successfully completed a clinically appropriate substance abuse treatment program.

[3] Pursuant to Ind. Evidence Rule 201, we take judicial notice of the fact that an Indiana Department of Correction Offender Database Search shows that Father's current earliest possible release date is in 2025. *See* www.in.gov/apps/indcorrection/ofs/ofs?lname=Trivett&fname=Terry&search1.x=34&search1.y=14 (last visited December 11, 2019).

made" after the CHINS proceedings had begun. *Transcript* at 118. In FCM Mitchell's opinion, termination was in the Children's best interests.

[18] DCS presented evidence that the Children are doing well in their current placements and are bonded with their caregivers. D.T. has been with the same foster family since April 28, 2017. His foster mother is meeting all of D.T.'s extensive medical and special needs. D.T. is in a pre-adoptive home. The other children are together in kinship care with L.S. and her family. This is a pre-adoptive placement for T.T. and S.T., but not M.T., who has behavioral and emotional issues. L.S. testified that she believes M.T. needs to be in a home with someone that can devote more time to her individually, which was difficult for L.S. with four other children in her care. DCS had identified a paternal aunt in Ohio as a possible pre-adoptive placement for M.T., and L.S. expressed a commitment to maintaining the sibling bond with visits between T.T., S.T., and M.T.

[19] The trial court took the matter under advisement at the conclusion of the termination hearing. Thereafter, on May 29, 2019, the trial court issued an order involuntarily terminating the parent-child relationship between Father and each of the Children. Father now appeals.

## Discussion & Decision

[20] When reviewing the termination of parental rights, we will not reweigh the evidence or judge the credibility of the witnesses. *In re R.S.*, 56 N.E.3d 625, 628 (Ind. 2016). Instead, we consider only the evidence and reasonable inferences

most favorable to the judgment. *In re D.D.*, 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), *trans. denied.* In deference to the trial court's unique position to assess the evidence, we will set aside its judgment terminating a parent-child relationship only if it is clearly erroneous. *In re L.S.*, 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), *trans. denied.* In light of the applicable clear and convincing evidence standard, we review to determine whether the evidence clearly and convincingly supports the findings and whether the findings clearly and convincingly support the judgment. *In re R.S.*, 56 N.E.3d at 628.

[21] We recognize that the traditional right of parents to "establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution." *In re M.B.,* 666 N.E.2d 73, 76 (Ind. Ct. App. 1996), *trans. denied.* Although parental rights are of constitutional dimension, the law provides for the termination of these rights when parents are unable or unwilling to meet their parental responsibilities. *In re R.H.*, 892 N.E.2d 144, 149 (Ind. Ct. App. 2008). In addition, a court must subordinate the interests of the parents to those of the child when evaluating the circumstances surrounding the termination. *In re K.S.*, 750 N.E.2d 832, 836 (Ind. Ct. App. 2001). The purpose of terminating parental rights is not to punish the parents, but to protect their children. *Id.*

[22] Before an involuntary termination of parental rights may occur in Indiana, DCS is required to allege and prove by clear and convincing evidence, among other things, that one of the following is true:

(i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

(ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

(iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services[.]

Ind. Code § 31-35-2-4(b)(2)(B); Ind. Code § 31-37-14-2. DCS must also prove by clear and convincing evidence that termination is in the best interests of the child and that there is a satisfactory plan for the care and treatment of the child. I.C. § 31-35-2-4(b)(2)(C), (D); I.C. § 31-37-14-2.

[23] On appeal, Father asserts that there is insufficient clear and convincing evidence that the conditions resulting in the Children's removal would not be remedied, that the continuation of the parent-child relationship poses a threat to the well-being of the Children, that termination is in the best interests of the Children, and that there is a satisfactory plan for the care and treatment of the Children following termination. We will address each in turn as needed.

[24] DSC presented ample evidence to establish by clear and convincing evidence that there is a reasonable probability that the conditions resulting in the Children's removal or continued placement outside the home will not be

remedied by Father.[4]  In making this determination, the trial court must judge a parent's fitness to care for his children at the time of the termination hearing, taking into consideration evidence of changed conditions.  *In re J.T.*, 742 N.E.2d 509, 512 (Ind. Ct. App. 2001), *trans. denied*.  The court must also evaluate the parent's habitual patterns of conduct to determine whether there is a substantial probability of future neglect or deprivation of the children.  *Id.*  In conducting this inquiry, courts may consider evidence of a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment.  *A.F. v. Marion Cty. Office of Family & Children*, 762 N.E.2d 1244, 1251 (Ind. Ct. App. 2002), *trans. denied*.  Further, it is within the trial court's discretion to disregard efforts made only shortly before termination and to weigh more heavily a parent's history of conduct prior to those efforts.  *K.T.K. v. Ind. Dep't of Child Servs.*, 989 N.E.2d 1225, 1234 (Ind. 2013).  "A pattern of unwillingness to deal with parenting problems and to cooperate with those providing social services, in conjunction with unchanged conditions, support a finding that there exists no reasonable probability that the conditions will change."  *In re L.S.*, 717 N.E.2d at 210.

[25]  Here, the evidence establishes that DCS had been working with the family and providing services since August 2016 through the IA and then the CHINS proceedings.  By his own admissions, Father did not take services seriously and

---

[4] The trial court determined that DCS had proven both subsections (b)(2)(B)(i) and (b)(2)(B)(ii).  Because DCS was required to establish only one of these by clear and convincing evidence, we focus our review on subsection (b)(2)(B)(i).

did not actively engage in services or attend to the medical needs of D.T. He left all of that to Mother, who was similarly not progressing with services. Even after the IA was closed and the CHINS petition was filed, Father continued to use illegal drugs and alcohol, essentially ignore services, and not provide his family with safe, stable housing. Then, after the Children were adjudicated CHINS, Father committed armed robbery and other crimes in June 2017, which resulted in a lengthy prison sentence. For more than a year into his incarceration, Father initiated no contact with FCM Mitchell and did not seek out available DCS services, such as Father Engagement. In sum, Father made no real effort toward reunification until after the termination proceedings began. He started the RWI Program in September 2018 but, as of the termination hearing, had yet to complete the program or obtain a modification of his sentence. Currently, Father's release date remains in 2025.

[26] We find unavailing Father's attempts to liken this case to that of *K.E. v. Ind. Dep't of Child Servs.*, 39 N.E.3d 641 (Ind. 2015). The father in *K.E.* was incarcerated before his child was born and taken into DCS custody and adjudicated a CHINS. Thus, the father was unable to care for his child solely due to his incarceration. While incarcerated, the father had regular visits and phone calls with his child, who was in the care of a paternal aunt. The father also completed over twelve programs in prison that related to self-improvement, parenting, and drug and alcohol abuse. In reversing the termination order in *K.E.*, our Supreme Court held that the father's possible release date of more than two years away was insufficient alone to demonstrate that the conditions

for removal will not be remedied. *Id*. at 648 ("[T]he potential release date is only one consideration of many that may be relevant in a given case."). Given the substantial efforts that he had made to improve his life by learning to become a better parent, establishing a relationship with his child, and attending substance abuse classes, the Court concluded DCS had not proven by clear and convincing evidence that the father could not remedy the conditions. *Id*. at 649.

[27] In the present case, the Children were removed from Father's care and adjudicated CHINS before he committed the crimes that resulted in his lengthy prison sentence. Further, despite opportunities, Father did not seek to improve himself as a parent during the IA or the CHINS and made little effort in prison until the termination proceedings began. Because of this, the GAL testified that her opinion that adoption was the correct plan for the Children would not change even if Father were to be released early from prison.

[28] Father has not made the same improvements and effort as the father in *K.E.*, his expected release date is about six years out, and his incarceration is not the sole basis for his failure to remedy the conditions that led to removal of the Children. Accordingly, while we commend Father for his recent efforts to better himself, we conclude that sufficient evidence supports the trial court's finding that the conditions that led to the Children's removal will not be remedied.

[29] Turning to the best interest factor, Father asserts, with little analysis, that the evidence was insufficient to support the trial court's finding that termination

was in the Children's best interests. In making this best-interests determination, the trial court is required to look beyond the factors identified by DCS and consider the totality of the evidence. *In re J.C.*, 994 N.E.2d 278, 290 (Ind. Ct. App. 2013). The court must subordinate the interest of the parent to those of the children and need not wait until a child is irreversibly harmed before terminating the parent-child relationship. *McBride v. Monroe Cty. Office of Family & Children*, 798 N.E.2d 185, 199 (Ind. Ct. App. 2003). Our Supreme Court has explained that "[p]ermanency is a central consideration in determining the best interests of a child." *In re G.Y.*, 904 N.E.2d 1257, 1265 (Ind. 2009). "Moreover, we have previously held that the recommendations of the case manager and court-appointed advocate to terminate parental rights, in addition to evidence that the conditions resulting in removal will not be remedied, is sufficient to show by clear and convincing evidence that termination is in the child's best interests." *In re J.S.*, 906 N.E.2d at 236.

[30] Father seems to suggest that the trial court's best interest determination was based solely on the fact that there is a better place for the Children to live. On the contrary, the evidence established that Father had been unable to provide a safe and stable environment for the Children, had failed to attend to D.T.'s extensive medical needs, and had committed a violent crime after the Children were adjudicated CHINS. Father made no progress with services in the year prior to being incarcerated and only began addressing his substance abuse issues after the termination proceedings began. His current expected release date from prison is in June 2025, when the Children will range in age from nine to fifteen

years old.  Like the GAL and FCM, we do not believe that the Children should be required to wait for Father's release and the unlikely possibility that he will have remedied the reasons for their removal.  They deserve permanency now in a stable home where their needs will be safely met.

[31] Finally, Father challenges whether there is sufficient evidence that DCS has a satisfactory plan for the care and treatment of the Children following termination.  He asserts that there is "manifestly no definitive plan at all" because M.T. is not in a pre-adoptive home and the Children are likely to be split up between three homes.  *Appellant's Brief* at 21.

[32] The evidence establishes that the plan for the Children is adoption, though not all in the same home.  D.T. is in a pre-adoptive home where his health has steadily improved since the age of thirteen months.  He is now over three years old, is bonded with his foster family, and has had no contact with Father for over two years.  The three older children are in L.S.'s kinship care.  L.S. would like to adopt T.T. and S.T.  While she is not prepared to adopt M.T. due to her individual needs, L.S. is willing to care for M.T. until a pre-adoptive placement is determined, which could be with a paternal aunt who is being considered by DCS.  L.S. also plans to facilitate sibling visits to maintain their bond.

[33] DCS's adoption plan is a satisfactory plan for the care and treatment of the Children.  *See In re D.D.*, 804 N.E.2d at 268 ("[the] plan need not be detailed, so long as it offers a general sense of the direction in which the child will be going after the parent-child relationship is terminated"); *see also In re A.S.*, 17 N.E.3d

994, 1007 (Ind. Ct. App. 2014) ("a plan is not unsatisfactory if DCS has not identified a specific family to adopt the children"), *trans. denied*. While we understand the desire to keep the Children together, a plan may be satisfactory even if it is for the children to have separate adoptive homes. *See In re A.S.*, 17 N.E.3d 1007 (citing *A.J. v. Marion Cty. Office of Family & Children*, 881 N.E.2d 706, 719 (Ind. Ct. App. 2008), *trans. denied*).

[34] Judgment affirmed.

Robb, J. and Bradford, J, concur.